## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **ERIC WARREN HEFTY**<br>**CHERYL RAE HEFTY** | Case No. **11-60039-11** |
| Debtors. | |
| **THE CORNER DEVELOPMENT, LLC**, | Case No. **11-60040-11** |
| Debtor. | |

## *MEMORANDUM OF DECISION*

At Butte in said District this 20th day of June, 2011.

In the above-captioned Chapter 11 cases, after due notice the Court held hearings at Missoula on May 19, 2011, on the motion to modify stay and the motion for adequate protection filed by Mountain West Bank ("MWB"). The Debtors Eric Warren Hefty ("Eric") and Cheryl Rae Hefty (together "Heftys") and The Corner Development LLC ("TCD") were represented by attorney Harold Van Dye ("Dye") of Missoula. MWB was represented by attorney Thomas Pardy ("Pardy") of Helena. Debtor Eric Hefty ("Eric") testified, and Debtors called real estate broker Ken Staninger ("Staninger") to testify. MWB called to testify Hefty's attorney Gary Chumrau ("Chumrau"), appraiser Tom Stuckey ("Stuckey"), and MWB employees Amy Randall ("Randall"), John Seeberger ("Seeberger") and Ron Zeiler ("Zeiler"). Debtors' Exhbiits A, C, D, E, F, G, and H, and MWB's Ex. 1, 1-A, 2, 2-A, 3, 4-A, 5, 5-A,7, 8 and 9 were admitted into evidence. At the conclusion of the parties' cases in chief the Court took both motions under advisement. For the reasons set forth below, MWB's motion to modify stay will be denied; and MWB's motion for adequate protection will be granted in part with respect to Eric's unauthorized

1

use of rents.

This Court has exclusive jurisdiction in this Chapter 11 case under 28 U.S.C. § 1334(a).

Rita's motion to modify stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G).  This

Memorandum of Decision includes the Court's findings of fact and conclusions of law.

## FACTS

Eric Hefty is an award-winning architect and real estate developer, and married to Cheryl

Hefty.  Heftys are managers and members of TCD.  Eric's development projects include

condominiums ("condos") located in Missoula, and a subdivision 5 miles from Missoula on a

hillside along the Clark Fork River known as Osprey Heights.  Heftys lived in a house which they

built on Lot 1 of Osprey Heights, until they moved  into the University Condos.  Eric testified that

Osprey Heights is a unique property which sits in the middle of 1,900 acres of open space that is

protected by conservation easements or parks.

The condo development undertaken by TCD is known as the "Corner Condos" consisting

of residential condos and a ground floor commercial condo at 901 S. Higgins in Missoula.  A

second condo development by the Heftys is known as the "University Condos" located at 400-418

Roosevelt St. in Missoula, which is adjacent to the Corner Condos.  Eric testified that the

University Condos were designed and built in 1908 or 1909 by architect A.J. Gibson as

apartments and have historical significance.

On October 13, 2006, TCD borrowed $2,270,882.52 from MWB.  Ex. 1-A is the

promissory note signed by Heftys on behalf of TCD for the principal loan amount of

$2,270,882.52, Loan No. 360002007.  Eric testified that the purpose of the loan evidenced in Ex.

1-A was to develop the Corner Condos, but that he has yet to complete that project because he ran

2

out of money.  He testified that there are eight residential condominium units in the Corner

Condos, and 1 commercial condominium unit, possibly 2, on the main floor.  The total main floor

square footage for the commercial condominiums is 4,100 sq. feet.

Ex. 2-A is a "Construction Deed of Trust" signed by Heftys and dated October 13, 2006,

and recorded on 10/20/2006.  Ex. 2-A grants to the trustee for MWB's benefit Lots 6, 7, 8, 9, and

10 of the Corner Condo Development at 901 S. Higgins in Missoula, to secure the debt of

$2,270,882.52.

Ex. 3 is a Deed of Trust signed by Heftys and dated October 13, 2006, and recorded on

10/20/2006.  Ex. 3 grants to a trustee for benefit of MWB Lots 2, 3, 4, 5, 6, and 7 of Osprey

Heights, a platted subdivision on Big Flat Road in Missoula County, Montana, to secure an

indebtedness in the sum of $2,270,882.52.

Ex. C[1] is an appraisal of the University Apartments[2] property securing MWB's loan, dated

June 12, 2008, prepared by Kraig P. Kosena ("Kosena").  Kosena also prepared Ex. D, an

appraisal of the University Flats property covering the same property as Ex. C securing MWB's

loan, also dated June 12, 2008.  Seeberger testified that MWB had the University Condos valued

by the appraiser both as condos and as apartments, but he clarified that MWB made the loan based

on the fact that they were apartments.

Heftys borrowed another $966,601.00 from MWB and signed a promissory note for Loan

_____

[1] Ex. C and D were admitted into evidence over MWB's objection.  Dye clarified that
Debtors offer Ex. C and D only for the purpose of showing that MWB asked to have the property
appraised as apartments and condos.

[2] University Apartments, University Flats and University Condos are different names for
the same property.

3

No. 3600025165, Ex. 1, on 12-26-2008.  Heftys gave MWB a Deed of Trust to secure Ex. 1.  Ex. 1 also provides that 100 percent (100%) of the net proceeds from the sale of condos will be used to repay that loan.  On 12/29/2008 MWB recorded a Deed of Trust (Ex. 2), which was signed by Heftys on December 26, 2008, to secure the $966,601.00 loan.  Ex. 2 gave MWB as security ten (10) units, Nos. 400, 402, 404, 406, 408, 410, 412, 414, 416 and 418 of the University  Condos.

Ex. 5 is an "Assignment of Rents" signed by Heftys on January 2, 2009, and recorded on January 5, 2009.  In Ex. 5 Heftys assigned to MWB as partial security, in addition to the Deed of Trust to the University Flats Condominium, all of Heftys' rights to rents due under leases of the University Flats Condo Units 400, 402, 404, 406, 408, 410, 412, 414, 416 and 418.  Eric testified that the University Condos have had a historic occupancy rate of 100% for the last 15 years, and that he rents them out for $750 to $800 per month.

Randall testified that the above-described loans were cross-collateralized.  Chumrau testified that he was not sure that the two loans were cross-collateralized.  Seeberger testified that between $230,000 and $240,000 of the University Condo loan paid off an existing encumbrance against the University Condos, and the balance went to pay construction costs of the Corner Condo development that Heftys and TCD needed to complete construction of the Corner Condos.  The Corner Condos remain unfinished.

Ken Staninger has been a real estate broker in Missoula for 40 years.  He testified that in 2009 he performed market analyses for MWB, at John Seeberger's request, of the properties owned by Heftys and TCD.  Ex. E is Staninger's market valuation for the Corner Condos residential and commercial units located at 901 South Higgins, dated September 28, 2009.  Using the Market Data Approach Staninger valued the fair market value of any leased commercial

4

properties at the Corner Condos at $16.00/sq. ft, based on a triple net lease.  He estimated the FMV of any commercial condominiums on Ex. E at $925,000, which represents approximately $225.00/sq. ft.  He estimated the values of residential Units 202, 204, and 302 of Corner Condos at $330,000[3], $295,000, and $350,000, respectively, on Ex. E, a total of $975,000.

Ex. F is Staninger's market valuation for ten of the twelve University Condos, dated September 28, 2009.  As in Ex. E, Staninger utilized the Market Data Approach to arrive at his values in Ex. F.  Based on the poor market conditions for Missoula condominiums, but their very convenient location, Staninger valued the five one-bedroom ground floor units at a fair market value of $160,000.00 each, and valued the fair market value of the five two-bedroom units at $170,000.00 each, with a total fair market value of the ten University Condo Units of $1,650,000. Ex. F.  Stuckey testified that the 10 Roosevelt Units were placed on the market in 2009 for approximately $335,000 per unit, but that none sold.

Ex. G is Staninger's valuation of the six residential building lots in Osprey Heights, dated September 4, 2009.  Ex. G acknowledges that the lots are quite steep, but have a view of the Clark Fork River and the Missoula Valley.  Using the Market Data Approach, and based on the "sluggish real estate market," Staninger valued the six Osprey Heights lots at between $75,000 and $90,000 on Ex. E, a total of $480,000.

The total value of Staninger's valuations of the condominiums and lots listed on Ex. E, F, and G is $3,105,000.  On cross examination Staninger testified that the market value for real property in Missoula has diminished since September 2009.  On redirect examination Staninger explained that bare land and commercial land are "extremely slow" and that for sales for

---

[3]Unit 202 was sold for the cash price of $255,504.  Ex. A.

residential housing "other than at the low end . . . meaning [$250,000] and below" sales have slowed and prices have come down.

Heftys and TCD defaulted on both of the above-listed loans. Zeiler, who is vice president of MWB's special assets division, testified that he dealt with the two loans as "criticized, problem loans." Chumrau testified that the Deeds of Trust, Ex. 2, 2-A, and 3, have not been reconveyed or released. Eric agreed that Ex. 2 and 3 were never reconveyed to him by MWB.

Ex. 10/H[4] is an "Agreement of Understanding Regarding Deeds" between Heftys, TCD and MWB dated January 6, 2010, which was drafted by Randall. Randall testified that Heftys and TCD were represented by counsel, Chumrau, while negotiating Ex. 10. Ex. 10 sets out the history of loan numbers 360002007, secured by the Corner Condos and the Osprey Heights lots, and loan number 360002516 secured by the University Condos. Ex. 10 states that loan 360002007 had matured, and loan 360002516 was in default due to failure to make timely payments, and Ex. 10 is the parties' settlement. Seeberger testified that both loans were in default prior to execution of Ex. 10.

Randall testified that the purpose of Ex. 10 was to provide Heftys with additional time to sell their properties securing MWB's loans, and in return MWB was given a truncated foreclosure procedure in which it would receive deeds in lieu that they could record if Heftys defaulted. Chumrau and Eric testified that Heftys received no new money from MWB, and Ex. 10 was just to obtain more time.

Paragraph 1 of Ex. 10 provides that Corner and Heftys will execute quitclaim deeds to all the real property security to be held by lender. Paragraph 4 states in part: "In conjunction with

---

[4]Ex. 10 and H are the same. For simplicity it will be referred to herein as Ex. 10.

6

the modification of loan number 360002007, the University Condominiums will be added as collateral for loan number 360002007." Paragraph 2 required Heftys and TCD to pay MWB at least $250,000 from the sale of security, and to sell a minimum of $750,000 in security units within 1 year. Randall testified that Section 2 of Ex. 10 allowed Heftys to make their payments from proceeds from the sale of any of the properties covered by Ex. 10. Paragraph 5 of Ex. 10 requires Heftys and TCD to make the regular payments on Loan 360002516.

Ex. 10 provides that if Heftys and Corner are unable to perform under the terms of Ex. 10, MWB had the right to record the quitclaim deeds upon five (5) days[5] written notice. If MWB records the deeds Corner and Heftys agreed to vacate the properties covered by the deeds within 10 days. Paragraph 8 of Ex. 10/H provides:

> Until such time that Lender records the deeds, if such event occurs, the Corner and Eric and Cheryl Hefty will remain in possession of the properties covered by the Deeds. During that time period, the Corner and Eric and Cheryl Hefty will market the properties covered by the Deeds for sale. The Corner and Eric and Cheryl Hefty will remain liable during that period for any harm, damage, or liability that arises as a result of their occupation of the properties covered by the Deeds of their attempts to sell such properties, and Lender will assume such liability after the time that the deeds are recorded.

Paragraph 11 of Ex. 10 provides that if Heftys and TCD perform under paragraphs 2 and 5, MWB will meet with them to negotiate further continuation of the loans to reach a new agreement. If Corner and Heftys paid the balance of the two loans in full, paragraph 12 of Ex. 10/H requires MWB to destroy the Deeds.

The quitclaim deeds for the Corner Condos, Osprey Heights lots, and University Condos were executed and given to MWB, and are in Seeberger's possession. Chumrau testified that if

---

[5]Randall testified that the 5-day notice period came from Heftys' attorney Chumrau.

the two loans were not cross-collateralized before, the effect of Ex. 10 was to cross-collateralize them because MWB could foreclose on any of the security as a result of a default, and the proceeds from the sale of any unit could be applied to either loan.

Randall testified that the deeds held by MWB for the Corner Condos are for the unsold/unfinished condos, including the first floor commercial condo.  The deeds held by MWB for the University Condos are for units which have tenants, not owners.  Randall testified that the tenants are paying rent.

Randall testified that Heftys paid the $250,000 of net sales within 6 months as required by Section 2 of Ex. 10, but that they defaulted on payments of the balance of $500,000 due within one year [a total of $750,000 was to be paid within one year].  Seeberger testified that MWB released back some of the funds to Eric at his request so that he could complete portions of the project.  Eric testified that he sold some units and paid MWB approximately $800,000, but he encountered delays and additional costs.  Before MWB could record its quitclaim deeds the Debtors filed their Chapter 11 bankruptcy petitions on the fifth day after MWB gave written notice.

Heftys filed their Chapter 11 petition on January 12, 2011.  TCD filed its Chapter 11 petition on January 13, 2011.  Randall testified that MWB still holds the Deeds of Trust recorded prior to Ex. 10, and also the quitclaim deed provided under Ex. 10, and that the Deeds of Trust were never released or reconveyed.  Eric testified that he defaulted on the loan secured by the University Condos, and that he has made no post-petition payments to MWB.

Eric also testified that he has not turned over any of the rents paid for the University Condos to MWB as required by Ex. 5.  He admitted that he used some of the rents to pay bills for

8

the Corner Development bankruptcy case until he realized he was not authorized do so.  No evidence exists in the record of the amount of his unauthorized use of rents.

Heftys and TCD filed their Schedules on January 31, 2011, and they amended their Schedules on April 13, 2011.  Without objection, the Court granted Debtors' motion for joint administration of these cases, naming Heftys' case as the lead case.

Heftys' Schedule A lists the 10 University Condos on Roosevelt as joint property with a current value of $1,780,000.00, encumbered by a secured claim in the amount of $968,966.64. Eric testified that he would entertain offers for the ten University Condos starting at $175,000. Schedule A also lists Units 420 and 422 of the University Condos valued at $356,000, encumbered by a secured claim in the amount of $273,475.00; and Lots 2 through 7 of Osprey Heights Subdivision with a current value stated in the amount of $1,240,000, but not encumbered by a secured claim.

Heftys' Schedule D lists MWB as a creditor with a disputed secured claim in the amount of $968,966.64, secured by Units 400, 402, 404, 406, 408, 410, 412, 414, 416 and 418 of Roosevelt Condos.  Missoula County Treasurer is listed on Schedule D with claims in the amounts of $16,500 secured by Osprey Heights; and $25,400 secured by Units 400, 402, 404, 406, 408, 410, 412, 414, 416 and 418 of Roosevelt Condos.  Heftys' Schedule F lists MWB as having a disputed unsecured claim in the amount of $2,310,284.50 described as "Cross-collateralization for The Corner Development, LLC."

TCD's Schedule A lists Units 202, 204, 302 and the commercial condo in the Corner Condos with a total current value in the amount of $1,445,000.00, securing a claim in the amount of $2,319,084.55.  Eric testified that Unit 302 is unfinished, and he valued Unit 302 at the sum of

9

$325,000.  Eric testified that Unit 204 has a value of $235,000.  He testified that he based those values on presales and offers which he has received, and his asking price is about the same as it was four years ago when he started the Corner Condo project.  Eric testified that he is asking $950,000 for the commercial condo on the main floor of the Corner Condo.

TCD's Schedule D lists secured claims, including a property tax claim of Missoula County Treasurer secured by the Corner Condos in the amount of $8,800, and MWB's claim secured by the Corner Condos listed as a disputed claim in the amount of $2,310,284.55.  Schedule F lists MWB as a creditor with an unsecured claim in the amount of $968,966.84, described as "Cross-collateral [sic] guaranty of Eric and Cheryl Hefty."  TCD's Statement of Financial Affairs at paragraph 1 lists income for 2010 from "Condo sales" in the amount of $345,000, and $1,276,971.14 in 2009 condo sales.

Stuckey is a licensed MAI appraiser with 40 years experience, who prepared recent appraisals of MWB's security.  Stuckey testified that the Missoula real estate market has declined at the rate of 9% compound appreciation per year since January 1, 2008.

Ex. 5-A is Stuckey's appraisal of the 3 partially finished residential condos and the partially finished commercial condo in the Corner Condo, dated March 9, 2011.  Stuckey testified that the Corner Condo building has been under construction since 2006 and portions are not finished.  He testified that the 3 residential condos were of "minimum shell finish."  Stuckey used the cost approach, but gave it little weight, and did not use the income capitalization approach. He relied mainly on the sales comparison approach.

Stuckey testified that he compared shell sales of finished buildings, plus tenant improvements, then adjusted sales downwards for the lack of finish, to arrive at comparable sale

10

values. He also adjusted his value downward because the residential units came with only a single parking space. Eric testified that of the 5 residential Corner Condo units have sold, four of those buyers have one car.

Stuckey concluded that the 3 residential units in the Corner Condo had a value based on the shell finish of from $110 per square foot (for Units 202 and 204) to $130 per square foot (Unit 302), and the commercial condo has a shell finish of $115 per square foot. Eric testified that the Corner Condo has exterior walls finished the public side, with insulation, but that he designed the back wall of the commercial Corner Condo, which faces the back of the University Condos, as a temporary wall to give the commercial tenants flexibility in how to complete the back with windows, doors and access.

Stuckey concluded in Ex. 5-A that the "as is" value of the Corner Condos is $830,000[6] as of March 9, 2011. He broke that value down between $469,000 for the three residential units, and $460,000 for the commercial condo. Stuckey further described the values for the residential units as $149,000 for Unit 202[7], $124,000 for Unit 204 and $196,000 for Unit 302.

The sale of Unit 202 for $255,504 cash was approved by this Court on May 19, 2011. This sale price works out to $188.85[8]/sq. ft. Under cross examination, Stuckey answered "yes" when asked by Dye if he agreed "that appraisals are a matter of opinion and what a property is worth is what somebody's willing to pay for it."

_____

[6]On pages 65-66 of Ex. 5-A Stuckey lowered the total value from $930,000 to $830,000 to reflect holding cost and commission.

[7]Stuckey valued Unit 202 in the amount of $148,830, and rounded it up to $149,000. Ex. 5-A.

[8]$255,504 divided by 1,353 sq. ft. = $188.85/sq.ft.

Stuckey's appraisal of the ten University Condo units, dated March 14, 2011, was admitted as Ex. 8.  Stuckey testified that Eric occupies two of the University units as a residence and office, and that Eric converted the other 10 units to individual condominiums before Stuckey prepared Ex. 8.  Although the 10 units are condos, Stuckey testified that, because of the decline in the market for condos in Missoula, it is not the most profitable or economically feasible use of these units to sell them as condos.

Stuckey utilized 3 approaches, i.e., sales comparison approach, cost approach, and income capitalization approach, to arrive at his opinion of value on Ex. 8.  He testified that the University Condo Units have had only minimal remodeling, that they have asbestos in the basement, and are in below-average condition.  Stuckey concluded that the "as is" value of the 10 units as of March 14, 2011, was $650,000 as apartments, and $100,000 less if valued as condos.  Ex. 8.

Ex. 9 is Stuckey's appraisal of Osprey Heights Lots 2, 3, 4, 5, 6, and 7.  Stuckey used only the sales comparison approach in preparing Ex. 9, and he used sales of property located in flood plain as his comparisons.

Stuckey testified that Osprey Heights received final subdivision plat approval[9] in 1999. Notwithstanding that subdivision plat approval, however, Stuckey testified that the highest and best use of the Osprey Heights lots is as recreation "or something that somebody could walk on, they could own."  Stuckey testified that, notwithstanding final plat approval, he was told[10] that it

---

[9]Stuckey testified: "Because of one person, the subdivision was forced through and approved."  Stuckey did not explain any difference between a subdivision which received final approval over opposition, and a subdivision which received final plat approval with no opposition.

[10]Stuckey did not identify who in the county planning department told him that it was not economically feasible to develop the Osprey Heights lots.

12

was not economically feasible to develop the subdivision because of the building restrictions, steep slope or topography of the lots, and the engineering which would be required to develop the water and septic systems.  Stuckey testified that buyers "can't cut the trees, they can't put in an RV, they can't build a cabin, they can't build a house; they can walk on it."  Stuckey admitted that he did not speak with Eric about Stuckey's concerns about the project not being economically feasible.

Under cross examination about the steep slope of the lots, Stuckey acknowledged that Heftys built on Lot 1 of Osprey Heights, but Stuckey insisted that Lots 2 through 7 have a "radically different slope" and are "substantially steeper."  Eric testified that he lived in a house he built on Lot 1 of Osprey Heights for 20 years, and raised his family there.  He testified that Lot 1 is flatter in front of the house on Lot 1, but that Lot 1 drops off and is just as steep or steeper as the other lots.  Eric testified that he won 2 national design awards and a state award for his house on Lot 1, and that the lots are safe for children to play.

Stuckey concluded in Ex. 9 that the total value of Lots 2 through 7 is $34,000 ("Extraordinary Assumption") as of March 31, 2011, and $94,000 if he includes the 31.3 acres of uphill common area.  Under cross examination Stuckey agreed that, if his assumption that the development of the subdivision is not economically feasible is incorrect, then his appraisal of Osprey Heights is not accurate.

Eric testified that his plans for the water and septic systems for the Osprey Heights lots have been engineered, and that he has received final approval from Missoula County and the State of Montana for the water and septic systems.  He testified that he hired Territorial Engineering to design the septic system, and those plans were submitted to and approved by the State of

13

Montana.

Eric testified that the Osprey Heights are taxed as residential lots based on values ranging from $150,000 to $152,000 per lot. Eric testified that in his opinion his Osprey Heights lots have a current market value of between $225,000 to $250,000 per lot, based upon sales of smaller lots nearby for $175,000, which lack the views and riverfront the Osprey Heights lots have. Eric testified that his plan on developing the Osprey Heights lots would be cheaper than on a flat site because of the slope, and because he will build with stilts instead of digging up a huge foundation and reconstructing the land. Eric's opinion of the total value of the 6 Osprey Heights lots ranges from $1,350,000 at $225,000 per lot, or $1,500,000 at $250,000/lot.

MWB filed its Proof of Claim No. 5 on April 8, 2011, the first page of which was admitted as Ex. 7 and Ex. 4-A. Claim 5 asserts a claim in the total amount of $3,277,006.07. Claim 5 states that its claim is secured by real property, rents and other security valued by MWB in the total amount of $684,000.00, and an unsecured claim in the amount of $2,593,006.07. The supplement to Claim 5 asserts that daily interest on Loan No. 360002516 accrues at the rate of $169.4837 per day; and that Loan No. 360002007 is undersecured, but that daily interest on the debt accrues at the rate of $365.3453 per day. Seeberger testified, and Eric agreed, that daily interest is accruing at roughly $534.83 per day. As of the date of the hearing, Seeberger testified that MWB's claim had increased to approximately $3,344,000. Eric testified that he has asked MWB for accounting of all the payments he made to MWB, but has never received an accounting from MWB.

MWB filed its motions for relief from the stay in both cases on April 8, 2011. In the motion for relief filed in the Heftys' Chapter 11 case MWB seeks relief to foreclose on its deeds

14

of trust on the University Condos, and the 6 Osprey Heights lots.  In the TCD case MWB seeks to foreclose on the Corner Condos Units 202, 204 and 302 and the commercial condo.

Both motions to modify the stay cite 11 U.S.C. § 362(d)(1) for cause, and § 362(d)(2). MWB argues that the "cause" for relief is lack of adequate protection because Debtors have made no post-petition payments to MWB, Debtors are unable to sell its security and Debtors have no equity in the property and are unable to propose a successful reorganization.

TCD filed its motion to sell Unit 202 of the Corner Condominiums for $255,504.00 cash free and clear of liens on April 20, 2011.  MWB filed a response stating that it has no objection so long as its lien attaches to the proceeds.  That sale motion was heard on May 19, 2011, after which the Court granted the motion and entered an Order (Dkt. 53 in Case No. 11-60039-11) authorizing the sale of Unit 202 for $255,504.00 free and clear of liens, with all valid liens attaching to the proceeds and further ordering the proceeds to be segregated and preserved until specific order of this Court.

Heftys and TCD filed objections to MWB's motions to modify stay on April 25, 2011, in their respective cases.  Both objections contend that MWB no longer has a first lien position on the University Condo Units 402 through 418 as alleged in the Heftys' case, or on Corner Condo Units 202, 204 and 302, and Heftys deny that MWB has a lien on Osprey Heights.  The Debtors argue that MWB's notes and deeds of trust were superseded by the Ex. 10, the Agreement of Understanding, which they argue is illegal and in violation of public policy, that the deeds in lieu of foreclosure have not been recorded and are avoidable under 11 U.S.C. § 544(a)(3).  Heftys object that the Stuckey appraisals are "wildly incorrect" because the University Condos were appraised as apartments, not condominiums, and the Osprey Heights lots are appraised at only

15

$5,000 per lot.  TCD objects that Stuckey's appraisal of the Corner Condo Units ignored prior

cash offers and Stuckey's prior appraisal of the same property.  MWB replied in both cases that

Ex. 10 did not supersede their recorded deeds of trust, that the Agreement of Understanding was

negotiated and is not illegal or in violation of public policy, that MWB provided Heftys and TCD

with the opportunity to cure their defaults, and that when they failed to cure their defaults Debtors

prevented MWB from recording their deeds in lieu by filing their Chapter 11 petition.

On April 29, 2011, MWB filed its motion for adequate protection in the Heftys' case.

That motion alleges that Debtors have failed to make post-petition payments, that Debtors

assigned all rents to MWB by Ex. 5, and that its claim exceeds the value of its security.  As

adequate protection MWB requests that Debtors be required to pay MWB all rents collected, that

Debtors pay all taxes and insurance on the subject property, that MWB be allowed to examine and

inspect the property during ordinary business hours, and that Debtors pay MWB all proceeds from

the sale of MWB's security.  Heftys objected repeating its objections to MWB's stay motion, *viz.,*

that MWB no longer has a perfected security interest in the collateral.

On May 18, 2011, Heftys and The Corner Development filed a complaint against MWB

initiating Adversary Proceeding No. 11-00040.  The complaint seeks to determine the secured

status of MWB, and to avoid its unrecorded deeds of trust under § 544(a)(3).  Plaintiffs seek a

declaratory judgment that the Agreement of Understanding, Ex. 10, vitiated and superseded the

deeds of trust and that MWB's liens are avoided.  MWB filed an answer denying material

allegations and praying for judgment in its favor.

On May 20, 2011, the Court entered its Order in the Heftys' case (Dkt. 53) granting their

motion to sell Corner Condo Unit 202 free and clear of liens to Michael and Debra Durbin for the

16

cash sum of $255,504.00[11].  Eric testified that the Durbins approached him to buy Unit 202 for cash, and that he has a separate agreement to finish Unit 202 for an additional cost.  Zeiler testified that, even if the other Corner Condo units sold at equivalent prices, MWB would still be left with a large deficiency.

Eric testified that he and Cheryl purchased two of the University Condo units, and that the University Condos were listed for sale, but have not been listed for sale for about 6 months to a year.  He testified that he would sell them if he had a buyer, either individually or all of them.  Eric testified that they do not have an asking price for the University Condos, but that he would be willing to sell them in the range of $175,000 for each of the ten units.

Eric testified that there are two remaining Corner Condo residential units to sell, which are unfinished[12].  He testified that he has had two offers for a combination of units in the Corner Condos which he rejected as inadequate, but which were for more money than Stuckey's appraisal.

Eric testified about his attempts to use new tax credits to market both the Corner Condos and the University Condos.  Eric described other possibilities for development of the Corner Condos which he is exploring, including conversion into a boutique hotel, an art gallery, or a restaurant, food court and deli, beauty school[13].  Eric has received "lowball offers" on the Corner

---

[11]The Court ordered the proceeds segregated in a separate interest bearing savings account.  Eric testified that all the proceeds go to MWB if it has a valid lien on the property.  He recognized that he cannot use proceeds without court authority, after notice to MWB.

[12]Unit 202 was sold unfinished.  Eric has a separate agreement with the buyers to finish it.

[13]He testified that the Corner Condo is zoned B1 and already is a planned unit development.

Condo commercial space which he rejected.

## DISCUSSION

MWB's motion to modify stay is based upon § 362(d)(1) and (d)(2).  Section 362(d)(1) allows for the granting of relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest[.]"   This Court explained the standard for modifying the stay for "cause" under § 362(d)(1) in *In re Westco Energy, Inc.*, 18 Mont. B.R. 199, 211-12 (Bankr. D. Mont. 2000):

> Section 362(d), however, provides that, "[on request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay" in three instances.  The subsection relevant to these proceedings is § 362(d)(1), which allows for the granting of relief from the automatic stay "for cause".[14]  What constitutes cause for purposes of § 362(d) "has no clear definition and is determined on a case-by-case basis." *Tucson Estates*, 912 F.2d at 1166.  *See also Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In the Matter of Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (Relief from the automatic stay may "be granted 'for cause,' a term not defined in the statute so as to afford flexibility to the bankruptcy courts.").

Section 362 vests this Court with wide latitude in granting appropriate relief from the automatic stay, and a decision to lift the automatic stay is within a bankruptcy court's discretion, and subject to review for an abuse of discretion.  *In re Delaney-Morin*, 304 B.R. 365, 369-70 (9th Cir. BAP 2003); *In re Leisure Corp.*, 234 B.R. 916, 920 (9th Cir. BAP 1999); *In re Plummer*, 20 Mont. B.R. 468, 477-78 (Bankr. D. Mont. 2003); *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d

---

[14]  Section 362(d)(1) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section , such as by terminating, annulling, modifying, or conditioning such stay–

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]

107, 108-109 (9th Cir. 1995).

Section 362(d)(2) provides for the granting of relief from the stay if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." The burden of proof under subsection (d) on the issue of the debtor's equity in property, and the party opposing such relief has the burden of proof under all other issues. 11 U.S.C. § 362(g). Therefore MWB has the burden of proof on the issue of the Debtors' equity.

With respect to MWB's motion based on § 362(d)(1) for "cause," as the party seeking relief MWB must first establish that cause exists for relief under § 362(d)(1). *United States of America v. Gould (In re Gould)*, 401 B.R. 415, 426 (9th Cir. BAP 2009), citing *Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 206 B.R. 196, 200 (9th Cir. BAP 1996). Once a prima facie case has been established, the burden shifts to the debtor to show that relief from the stay is not warranted. *Id.*

MWB's motions to modify the stay and for adequate protection both refer to the Debtors' unauthorized use of rents which were assigned to MWB under Ex. 5. Those rents will be addressed below discussing MWB's motion for adequate protection.

The Debtors' objections to MWB's motions assert that MWB does not have valid security interests at all. However, a creditor's claim or security is not finally determined in a relief from stay proceeding. *Veal v. American Home Mortgage Servicing, Inc., et al. (In re Veal)*, 2011 WL 2304200, __ B.R. __ (9th Cir. BAP June 10, 2011); *Johnson v. Righetti (In re Johnson)*, 756 F.2d 738, 740-41 (9th Cir. 1985). All actions to determine the validity of a lien, such as a preference action under § 547, require an adversary proceeding under F.R.B.P. 7001(2). *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994), adopting *Matter of Vitreous Steel Prods. Co.*, 911

19

F.2d 1223 (7th Cir. 1990).  "To allow a relief from stay hearing to become any more extensive than a quick determination of whether a creditor has a colorable claim would turn the hearing into a fullscale lawsuit . . . and would be inconsistent with this procedural scheme."  *Grella*, 42 F.3d at 33.

In *In re Luz Intern., Ltd.*, 219 B.R. 837, 843 (9th Cir. BAP 1998), the BAP reversed a bankruptcy court's granting of a setoff in the course of granting a motion to modify stay.  The BAP explained that the hearing on a motion to modify stay is a summary proceeding in which a court should seek only to determine whether the party seeking relief has a colorable claim to property of the estate, and the expedited nature of the hearing "limits the court's ability to make a full adjudication of the merits of the parties' claims.  *Id.* at 842.  The BAP recently cited *Luz* in holding "that a party seeking stay relief need only establish that it has a colorable claim to enforce a right against property of the estate."  *Veal* at __; *United States v. Gould (In re Gould)*, 401 B.R. 415, 425 n.14 (9th Cir. BAP 2009); *Grella*, 42 F.3d at 32.

Therefore, in deciding MWB's motions to modify stay the Court cannot decide the main defense raised in Debtors' objection because they attack the validity and extent of MWB's liens.  Based on the Deeds of Trust and other exhibits admitted at the hearing, the Court finds that MWB has a colorable claim to the property of the estate, and the validity of MWB's liens remains to be determined in Adv. No. 11-00040.  On the other hand the Court notes that Ninth Circuit authority and a leading commentator recognize that a debtor in possession has the status of a trustee under § 544(a)(3) to avoid any transfer of property of the debtor that is voidable by a bona fide purchaser of real property.  *In re AEG Acquisition Corp.*, 127 B.R. 34, 43 (Bankr. C.D. Cal. 1991), *aff'd sub nom.*, *In re AEG Acquisition Corp.*, 161 B.R. 50 (9th Cir. BAP 1993); *see also* Alan R. Resnick,

Henry J. Sommer, 7 COLLIER ON BANKRUPTCY, ¶ 1107.03[4] (16th ed. 2010).  Therefore the Court must be cautious about granting relief from the stay, given the unknown result to come from Adv. 11-40.

Turning to MWB's contention that it lacks adequate protection because Debtors lack an equity in the security, MWB has the burden of proof.  11 U.S.C. § 362(g)(1).  The evidence admitted at the hearing includes eight (8) appraisals, plus Eric's opinion of the values of the collateral.  The Court disregards the valuations contained in Staninger's and Kosena's appraisals as too remote in time.

What remains are Stuckey's appraisals, and Eric's opinion of the values of the Corner Condos, Osprey Heights, and the University Condos.  Stuckey is a licensed and experienced appraiser.  Eric, however, is a practicing architect and experienced developer and these are his projects.

For purposes of valuation, an owner is competent to give his or her opinion on the value of his or her property, most often simply by stating the conclusion without stating a reason.  *See* Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL, 2010 ed. § 701:2; *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir. 1980).  While a debtor's estimate of value may be acceptable in certain cases, the Court may give little weight to an opinion if not based upon sufficient facts.  *In re Plummer*, 20 Mont. B.R. 468, 478 (Bankr. D. Mont. 2003); *In re Hungerford*, 19 Mont. B.R. 103, 118-19 (Bankr. D. Mont. 2001).  Eric testified in detail about the facts upon which he based his value opinions.

Beginning with the Corner Condos, Stuckey in Ex. 5-A placed a total value of the Corner Condos at the amount of $830,000, including Stuckey's opinion of the value of Unit 202 at

21

$149,000. Stuckey admitted that an arms-length cash transaction is a more accurate measure of value. The sale of Unit 202 for the sum of $255,504 cash has been approved by the Court. The effect of that sale is to undermine the weight the Court assigns to all of Stuckey's appraisals. His $149,000 opinion of the value of Unit 202 is more than $106,500 off the cash sale price. The evidence shows that Eric has the ability to sell condos, to sell them for far more than Stuckey's opinion in the case of Unit 202, and further that Eric has the ability to generate additional revenue for his reorganization by negotiating separate agreements like the agreement to finish Unit 202.

Stuckey's opinion of the value of the remaining two residential Corner Condo Unit Nos. 204 and 302, plus the commercial condo, is $681,000[15]. Eric's opinion is that the remaining Corner Condo units have a total value of $1,510,000, consisting of $325,000 for Unit 302, $235,000 for Unit 204, and $950,000 for the commercial condominium. The Court finds that Eric's opinion on the Corner Condo values are entitled to greater weight that Stuckey's opinion, primarily because of the approved sale of Unit 202 for $255,504. The Court notes Eric's testimony of the significance of the Corner Condo and University Condo buildings, his contacts and plans for development, and his experience as an architect and developer, all add to the weight the Court gives his opinion.

Next, Stuckey values the Osprey Heights lots at the amount of $34,000, or $90,000 if the common areas are included. Stuckey based his opinion on what he was told was the lack of economic feasibility to engineer the water and septic systems. Stuckey simply discounted the fact that Eric had obtained final plat approval for the Osprey Heights subdivision. Stuckey ignored the evidence admitted at Court, which was not controverted by any evidence, that Eric contracted with

---

[15]$830,000 minus $149,000 = $681,000.

22

a professional engineering firm to complete and obtain final approval from the appropriate county and state authorities for the water and septic systems, and that final approval for those systems has been granted.  Instead of a completed subdivision of unique river view lots, located up a steep slope from the river, Stuckey used comparable sales from flood plains to arrive at his $34,000 value.  Stuckey's value presumes that no building on the Osprey Heights lots can take place, thereby ignoring the evidence that Eric built a house on Lot 1, lived there for 20 years and raised a family on a lot which was just as steep in places as the lots which are MWB's security.  Stuckey is a licensed appraiser, but he did not show that he is qualified to give an opinion of the feasibility of constructing homes on the Osprey Heights lots.  Eric is qualified to give an opinion of value as owner, and he is qualified as an architect and developer with actual experience building on Lot 1, of the feasibility of building homes on the other lots.  Based upon Eric's testimony, the Court finds that the value of the six Osprey Heights lots is the $1,350,000, the lower end of the range Eric gave.

The third development is the ten University Condos.  Stuckey's appraisal Ex. 8 valued the ten University Condos at the amount of $650,000 as apartments, and $550,000 as condos because of what he described as the decreasing Missoula market.  Eric testified that the University Condos have a value of $175,000 each, or $1,750,000.  In weighing the values of the University Condos, the Court repeats that Stuckey's appraisals of the Corner Condos and Osprey Heights have what the Court considers serious shortcomings, which persuaded the Court to assign Stuckey's value opinion for those first two properties little weight.  Frankly, that doubt spills over and adversely affects the weight the Court feels it is able to give Stuckey's opinion on the value of the ten University Condos.

23

The University Condo building has an historic significance.  Eric has demonstrated an ability to develop and market condo units in the Corner Condo building, and generate new revenue from completion contracts such as with Unit 202 of the Corner Condo.  The Court sees no reason why Eric would not be able to market and sell the University Condos at or near his $175,000 opinion of value.  Stuckey's testimony regarding the slowness of the market for condos was contradicted by Staninger, who is a licensed real estate broker with actual sales experience.  Staninger testified, "other than at the low end . . . meaning [$250,000] and below" sales have slowed and prices have come down.  The Court recognizes that Staninger may have been solely referring to single family residences when he made the statement concerning the sales experience below $250,000.  However, the parties did not distinguish the sales experience between single family residences and single family condos.  Eric's $175,000 value opinion for each of the University Condos may be at the low end, and so according to Staninger the sales for condos priced at $175,000 may not have slowed as much as condos priced above $250,000.  The recent sale at the Corner Condo provides support for that finding.  Based on this evidence the Court gives little weight to Stuckey's appraisal, Ex. 8, and the Court finds that the total value of the ten University Condos is Eric's opinion of $1,750,000.

The total value of the Corner Condos ($1,510,000), ten University Condos ($1,750,000) and six Osprey Heights lots ($1,350,000) found by this Court, based on the evidence discussed above, is the amount of $4,610,000.  MWB offered testimony at the hearing that its claim on the hearing date was $3,344,000.  The difference is $1,266,000.00 which represents an equity cushion of 38 percent (38%) which this Court finds constitutes adequate protection.  With interest accruing at $534.83, the equity cushion shown by the evidence will pay interest on MWB's claim

for more than 2,367 days before it is exhausted.  The Court concludes that MWB has failed to satisfy its burden of proof under § 362(g)(1) and § 362(d)(2)(A) that the Debtors do not have any equity in MWB's security.

If MWB had satisfied its burden of proof under § 362(d)(2)(A), the Debtors would have had the burden of proof under § 362(d)(2)(B) of showing that the property is necessary to their effective reorganization.  The Court finds that Debtors have satisfied their burden under § 362(d)(2)(B).  According to Eric's testimony, the Debtors' reorganization in both cases depends on the Debtors being able to market, sell and develop the Corner Condos, University Condos and Osprey Heights.

MWB also moves for relief from the stay under § 362(d)(1) for "cause" based upon the lack of adequate protection, lack of post-petition payments, and Debtors' unauthorized use of rents.  Based on the evidence and 38% equity cushion found above, this Court exercises its discretion and denies MWB's motion to modify stay.  *Mataya v. Kissinger*, 72 F.3d at 108-109.  The Court finds that the Debtors have satisfied Debtors' burden of proof to show that relief from the stay should not be granted for "cause" under § 362(d)(1).

Turning to MWB's motion for adequate protection, the Court notes that Eric admitted using rents derived from rental payment received from the tenants of the University Condos, which Heftys had assigned to MWB in Ex. 5.  The Debtors have not filed a motion to use cash collateral in this case pursuant to 11 U.S.C. § 363(c)(2), and the Court has not granted the Debtors leave to use MWB's cash collateral.

This Court discussed the concept of adequate protection in *In re WRB West Associates Joint Venture*, 106 B.R. 215, 219-20 (Bankr. D. Mont. 1989):

25

In a classic sense, adequate protection payments should be applied to compensate a secured creditor for any diminution in the value of collateral as a result of use, depreciation, destruction or other caused reduction in value. 11 U.S.C. § 361; 11 U.S.C. § 363(e); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1412 n. 57 (5th Cir.1986) (collecting supporting cases), *aff'd, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, [484] U.S. [365], 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 994 (Bkrtcy.D.Utah 1982) ('adequate protection was protection ... against depreciation of the collateral when it erodes the allowed secured claim.')."

[*Matter of Kain*,86 B.R. 506, 511, 513 (Bankr. W.D. Mich. 1988)]

On the issue of adequate protection required by § 363(d) and (e), *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987) holds:

"[2, 3] In recognition of the powers created in bankruptcy law to adjust debts and creditors' interest, Congress realized the need to protect creditors from unfair treatment. Hence, it codified the concept of adequate protection into the several aggressive remedies available to debtors and bankruptcy trustees. *See 2 Collier on Bankruptcy* ¶ 361.01[1] (15th ed. 1979). The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy. House Rep. No. 95-595, 95 Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6295. In determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis. *In re Martin*, 761 F.2d 472 (8th Cir.1985); *In re Monroe Park*, 17 B.R. 934 (D.C.Del.1982). Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact. *In re Martin*, 761 F.2d at 472; *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017 (11th Cir.1984); *In re Bank Hapoalim B.M., Chicago Branch v. E.L.I.*, Ltd., 42 B.R. 376 (D.C.N.D.Ill.1984); *Brookfield Production Credit Association v. Borron*, 36 B.R. 445 (D.C.E.D.Mo.1983), *aff'd*, 738 F.2d 951 (8th Cir.1984)."

*In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984) addressed the issue on a basis of "equity cushion" as adequate protection in holding:

"While the term 'adequate protection' is not defined in the code, 11 U.S.C. § 361

> sets forth three non-exclusive examples of what may constitute adequate
> protection: 1) periodic cash payments equivalent to decrease in value, 2) an
> additional or replacement lien on other property, or 3) other relief that provides the
> indubitable equivalent. *In re Curtis*, 9 B.R. 110, 111-112 (B.Ct.E.D.Penn.1981).

An equity cushion is the classic form of protection for a secured debt, and its existence, standing alone, can provide adequate protection under the code.  *In re Interstate Distributing Co., Inc.*, 13 Mont. B.R. 86, 89-90 (D. Mont. 1993) (*citing In re Mellor*,  734 F.2d 1400).

The evidence in this case shows a substantial equity cushion in this case in the amount of $1,266,000.  This amount could constitute adequate protection under § 361 were it not for the Debtors' unauthorized use of cash collateral in the form of rents.  On policy grounds the Court cannot overlook Debtors' failure to seek and obtain authority to use cash collateral before spending the rents.  To overlook it would be to suggest that such practice will not lead to adverse consequences.  On the other hand, no evidence exists in the record of the amount of rents the Debtors spent without authorization, and Eric testified that he stopped using the rents and has kept them segregated.  Unfortunately, the lack of any evidence of the amount of rents spent without court authority necessitates further proceedings.  Accordingly,

## CONCLUSIONS OF LAW

1.  This Court has original and exclusive jurisdiction of these Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a).

2.  MWB's motion to modify stay and motion for adequate protection are core proceedings under 28 U.S.C. § 157(b)(2)(G).

3.  MWB failed to satisfy its burden of proof under 11 U.S.C. § 362(d)(2)(A) and § 362(g)(1) to show that the Debtors do not have an equity in MWB's security.

27

4.  Debtors satisfied their burden of proof under § 362(d)(1) and § 362(g)(2) to show that relief from the automatic stay should not be granted.

5.  MWB satisfied its burden under 11 U.S.C. § 361 that adequate protection should be provided based upon Debtors' unauthorized use of rents which constitute MWB's cash collateral under 11 U.S.C. § 363  based on Ex. 5.  Further proceedings are necessary in order to determine the amounts of rents so used.

**IT IS ORDERED** a separate Order shall be entered in Case No. 11-60039-11 in conformity with the above, denying MWB's motions to modify stay filed in both of the above-captioned Chapter 11 cases.

**IT IS FURTHER ORDERED** the Debtors shall be directed to file with the Court and serve upon counsel for MWB, within 14 days, an accounting of all rents that the Debtors collected or received from the ten University Condos that were assigned to MWB by Ex. 5 (the "Assignments of Rents" signed by Eric Hefty and Cheryl Hefty on 1/2/09) found at Docket No. 55 filed in No. 11-60039-11, and then of all unauthorized disbursements from such cash collateral. Upon receipt of the accounting the Court will schedule another evidentiary hearing on the amount of adequate protection, if any, to be awarded to MWB.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

28